*after reviewing the objections, I adopt the Judge's Report & the Court's opinion, GRANT the Commissioner's motion, DENY Glover's cross motion, on the ground that there is substantial evidence that Plaintiff is able to perform "any" work, albeit not certain type of work, including her former position.*

*Colle 2 Jul.*

*USDJ 1/2/2013*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

Delphine GLOVER,

                Plaintiff,

      -against-

Michael J. ASTRUE,    MEMO ENDORSED
Commissioner of Social Security,

                Defendant.

----------------------------------------------------------X

10-CV-08942 (CM)(SN)

**REPORT AND
RECOMMENDATION**

*1/2/13*

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE COLLEEN MCMAHON:

      Plaintiff Delphine L. Glover ("Glover") brings this action pursuant to Section 205(g) of

the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the final

determination of the Commissioner of Social Security (the "Commissioner") finding her

ineligible for disability benefits from June 13, 2001 through July 13, 2007.[1] The Commissioner

has moved, and Glover has cross-moved, for judgment on the pleadings pursuant to Rule 12(c)

of the Federal Rules of Civil Procedure. In the alternative, Glover seeks remand for further

proceedings to develop the record and apply the proper legal standards.

      In reviewing the final determination of the Commissioner, a court must examine five

steps for determining disability and decide whether the ALJ's findings were supported by

---

[1] Glover alleges entitlement to two types of disability-related benefits under the Social Security Act: Disability
Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Because the definition of "disabled"
governing eligibility is the same for DIB and SSI, the term "disability benefits" refers to both. Chico v. Schweiker,
710 F.2d 947, 948 (2d Cir. 1983) (generally referring to "disability insurance benefits" because SSI regulations
mirror DIB regulations); Calzada v. Astrue, 753 F. Supp. 2d 250, 266-67 (S.D.N.Y. 2010).

substantial evidence at each step. In this case, only the fifth step is contested: whether the ALJ

correctly found that Glover's residual functional capacity (RFC) allowed her to perform work

that existed in significant numbers in the national and local economies. In reviewing the final

determination, the Court must examine the evidence supporting the ALJ's finding of Glover's

RFC and ability to perform other work. The Court must also assess Glover's objections to the

ALJ's finding of her RFC and determine if the ALJ erred by declining deference to the opinion

of Glover's treating physician and by discounting Glover's subjective assessments of her pain.

Because I conclude that there is substantial evidence to support the final determination,

and that the ALJ committed no legal error, I recommend that the Commissioner's motion be

GRANTED and Glover's motion be DENIED.

## FACTUAL BACKGROUND

The following facts are taken from the administrative record. Glover was born on April

23, 1962 and has three years of college education. (R. 45-46.) From April 1990 through April

1997, she worked as a conductor for the New York City Transit Authority ("NYCTA"), assisting

passengers and coworkers. (R. 48.) From February 1993 through April 1997, she also worked as

a letter carrier for the U.S. Postal Service, driving a truck and delivering parcels. (Id.) Glover

also has worked as a printer in a photo store from January 1989 through July 1989 and as a bank

teller from February 1985 through September 1988. (R. 112.)

In April 1997, Glover injured her right hand while working as a conductor and

subsequently stopped working.[2] (R. 49-51, 121, 138.) At first, she alleged that her disability

began on July 1, 1997 because of nerve damage to her right hand. (R. 62-66, 120, 282.) But at

---

[2] Glover has also stated she injured her right hand in two car accidents on June 29, 1997 and August 5, 1997. (R.
287.)

her first hearing before an ALJ, she amended the onset of her disability to June 13, 2001, a date with better evidentiary support. (R. 47.)

## I.      Medical Record

On June 13, 2001, Glover met with her treating physician, Dr. William King, for the first time since January 1998. (R. 193.) At that meeting, Glover stated that she had injured her right hand two months earlier and was experiencing symptoms related to carpal tunnel syndrome. (Id.) Dr. King found evidence of carpal tunnel syndrome in Glover's right upper extremity. (Id.) His examination revealed a "markedly" positive Tinel's sign and discomfort at the basal joint. (Id.)

On August 9, 2001, Glover returned for reevaluation with Dr. King, where she presented with symptoms of flexor tenosynovitis of the right finger. (Id.) At her August 15, 2001 visit, Glover reported continued numbness and tingling on her left hand, and examination revealed a positive Tinel's sign at her Guyon's canal and cubital tunnel. (R. 194.) On October 10, 2001, Glover reported continued difficulty with both upper extremities, paresthesia, positive Tinel's signs, and tenderness over the A-1 pulley of her left ring finger and small digit. (Id.) Dr. King proscribed the drug Vioxx as an anti-inflammatory. (Id.) Glover continued to report difficulty with both upper extremities at her October 18, 2001 visit. Dr. King found evidence of carpal tunnel syndrome and recorded his belief that Glover also had cubital tunnel involvement and Guyon's canal involvement of the right upper extremity and triggering of the little and ring fingers of the left hand. (Id.) Glover stopped taking Vioxx because of a reaction to the drug. (Id.) On November 28, 2001, Dr. King proscribed a brace for Glover's left and right basal joint problems and placed her on Naprosyn for her pain. (Id.)

3

Dr. King performed right carpal tunnel release surgery on Glover at the Hospital for Joint Diseases in New York on December 18, 2001. (R. 166-67.) The surgery revealed a markedly compressed median nerve with dense flexor tenosynovitis. (Id.)

By January 2, 2002, Dr. King reported that Glover was doing well following her surgery, that her paresthesia had improved, and that she would begin therapy with a hand therapist named Ann Lang. (R. 195.) By January 16, 2002, Dr. King reported that Glover was making good progress at hand therapy, although her surgery scar was still tender with hypertrophic sensitivity. (Id.)

On January 17, 2002, an electromyography and nerve conduction ("EMG/NCV") study performed on Glover revealed mild carpal tunnel syndrome, mild median nerve neuropathy on the left side and no neuropathy on the right side. (R. 227-28.) The findings were consistent with "residual transcarpal conduction slowing of a well treated carpal tunnel syndrome." (Id.) The study showed no evidence of significant ulnar nerve neuropathy at the wrists or elbows and no signs of significant cervical radiculopathy or polyneuropathy. (Id.)

On January 30, 2002, Dr. King reported that Glover had some hypertrophic induration of the incision and some tenderness over the distal radius. (R. 195.) He recommended that she continue hand therapy and stated that she was not able to return to work as a conductor. (Id.)

On February 13, 2002, Dr. King recorded that the EMG/NCV study had confirmed Glover's previously known carpal tunnel syndrome of the left hand. (Id.) The study had found no electrophysiologic evidence of ulna nerve entrapment at her wrist or elbow, although the examining doctor did find clinical evidence of such entrapment; Dr. King concurred with the examining doctor's clinical finding. (Id.)

4

By March 21, 2002, Glover's paresthesia was "virtually resolved." (Id.) Because Glover still had an irritating scar following her carpal tunnel surgery, Dr. King administered a steroid injection. (Id.) Glover returned for examination on April 11, 2002 and May 8, 2002, and Dr. King found that Glover's condition again had improved. (R. 195-96.) At the May visit, he further noted that her surgery had been "quite successful" and her scar was much less indurated, although she still had a small volar ganglion that occasionally was problematic. (R. 196.)

On June 6, 2002, Glover returned for reevaluation. At her request, Dr. King wrote that after her December 18, 2001 right hand surgery, and "[b]ecause of the severe difficulty that she had had with her right hand[,] . . . it was necessary for her to utilize her left hand for most of her activities of daily living . . . . [which] resulted in symptoms" requiring surgery. (Id.)[3] On July 8, 2002, Dr. King stated that Glover needed continued scar management for her right hand and had occasional paresthesia when driving; Dr. King advised her to avoid particular positions and reapply her splint. (Id.)

Glover continued to report difficulty with her right hand and basal joint. On August 5, 2002, Dr. King ordered a wrist, hand and thumb orthotic. (Id.) On September 5, 2002, she was given an injection for her basal joint problem. (Id.)

By September 16, 2002, Glover reported improvement as a result of her injection, although she still had tenderness at the scar and triggering; Dr. King taped her left ring digit to relieve the problem. (Id.) Glover continued to report improvement at her October 2, 2002 visit to Dr. King, although she described tenderness at a joint of her thumb and at the A-1 pulley of her hand. (R. 197.) Dr. King recorded that Glover's left ring finger occasionally locked at night, but was stable at the examination. (Id.) He also found Glover's right basal joint to be symptomatic.

---

[3] This information was entered because the presiding judge at Glover's workers' compensation hearing requested that she have any consequential injury from overuse of her left hand noted by Dr. King. (R. 196.)

(Id.) By October 21, 2002, Dr. King reported that the desensitization program was working well, Glover's left finger was improving through taping, and Glover had much less tenderness in the scar although her right basal joint was slightly tender. (Id.) Again on November 21, 2002, Dr. King reported steady improvement in Glover's right hand. (Id.)

On December 6, 2002, Dr. King, with the assistance of Drs. Levine and Matthews, performed left carpal tunnel release and median nerve decompression surgery on Glover's left wrist. (R. 163-65.) There were no complications. (Id.) Following the surgery, on December 12, 2002, Dr. King examined Glover, and found her to be doing "quite well" with no discomfort and no paresthesia. (R. 197.) Dr. King reported a similar progress and lack of paresthesia at his December 19, 2002 examination. (Id.)

In addition to her 2002 visits to Dr. King, Glover also saw hand therapist Ann Lang twice a week throughout the latter half of 2002. (R. 217-22.) On June 21, 2002 Lang reported that Glover was using her right hand "with escalating success and spontaneity in light, lightly and some moderately resistive daily living tasks." (R. 217.) Glover remained limited "in sustained, repetitive and resistive grip, pinch, lifting, pushing and pulling activities," which included "carrying groceries, poiring [sic] from 1/2/ [sic] gallon containers, etc. due to weakness and limited endurance." (Id.) Similar observations were recorded on July 15, 2002, (R. 218), and October 16, 2002 (R. 220). For October, Glover's gross grasp strength was 50 pounds of pressure in her right hand and 90 pounds of pressure in her left. (Id.) In a December 20, 2002 visit following Glover's surgery, Lang found that Glover was avoiding using her left hand functionally due to pain and the recent operation. (Id.)

Glover returned to Dr. King for post-surgery evaluation on January 8, 2003. (R. 197.) Dr. King recorded good resolution of Glover's paresthesia and good progress in her trigger thumb,

6

but also hypersensitivity at her surgery incision and tenderness at her basal joint. (Id.) Similarly, on February 5, 2003, Dr. King reported continued progress after the surgeries, but right side basal joint discomfort. (Id.) He treated her with an injection. (Id.)

On March 5, 2003, Dr. King found that Glover still had some basal joint problems and flexor tenosynovitis on her right hand. (R. 198.) He reported her prognosis for returning to work as a conductor to be "quite guarded." (Id.) Her prognosis remained guarded through follow-up visits on March 20, 2003 and April 2, 2003. (Id.) In her March visit, she again was prescribed Vioxx. (Id.) During the April visit, Glover reported continued problems with her hands despite the satisfactory surgeries. (Id.) Dr. King wrote that, "[a]s I have stated previously I feel that she should change her occupation or retire." (Id.) Despite Glover's difficulties with her hands, on May 7, 2003, Dr. King stated that Glover continued to improve following her surgery, although she reported sporadic basal joint difficulty. (Id.) A physical examination revealed tenderness at both basal joints. (Id.) At that date, Glover also complained of a "recent involvement of her neck," and Dr. King found cervical radicular signs. (Id.) Dr. King again stated that Glover should change occupation or retire. (Id.)

On May 27, 2003, Glover returned to hand-therapy. (R. 223.) She did not report significant problems with her left hand, and Lang found that her right hand could be used cautiously in light and lightly resistive daily living tasks. (Id.) Glover remained limited in sustained, repetitive and resistive grip, pinch, lifting, pushing and pulling activities due to pain and secondary weakness. (Id.) Moreover, finer manipulative control was impaired on the right side by joint stiffness and pain. (Id.) Glover's gross grasp strength had decreased to 20 pounds of pressure in her right hand and 80 pounds of pressure in her left hand. (Id.)

7

On May 29, 2003, Glover was examined by Dr. Ivanson, a consulting neurologist. (R.
175-79.) Glover denied a history of neck pain at this meeting, but complained of six years of
tingling and pain in her right hand that had left her "unable to do anything." (R. 175.)

Dr. Ivanson described Glover's general condition as that of a "well-developed female in
no apparent distress." (R. 176.) He found "5/5" muscle strength in both of her legs and in her left
arm. (R. 177.) She was unable to move any muscles of her right hand and forearm due to pain,
although "[a]s soon as she [was] left unobserved, she was able to move her right hand." (Id.) Her
right hand muscle tone was normal and there was no muscle rigidity or tremor. (Id.) During his
sensory examination, he found that light touch was diminished in two of her fingers and there
was a positive Tinel's sign on the right elbow and wrist. (Id.)

Dr. Ivanson's overall impression was that Glover's history of right hand pain and
numbness was likely caused by carpal tunnel syndrome in her right hand and the possible
entrapment of her left ulnar nerve on her right arm. (R. 178.) He found no limitation in Glover's
standing, walking, traveling, sitting, hearing or speaking, but also noted that she had marked
limitation in her right arm for handling and fingering objects, pushing, pulling and lifting. (Id.)
His prognosis for her was "fair." (Id.)

On June 4, 2003, Dr. King reported continued improvement following Glover's surgery,
but also continued difficulty with her basal joints. (R. 198.) He advised Glover to wear her brace
and take Vioxx daily. (Id.) Glover returned for reevaluation on July 2, 2003, where examination
revealed continued general improvement and stabilization of her basal joints. (Id.) Glover's left
ulna nerve had become irritated, however, causing paresthesia. (Id.) Her prognosis for returning
to work as a conductor remained guarded. (Id.) On July 31, 2003, Dr. King found continued
ulnar neuritis in Glover's left elbow, positive Tinel's sign, subjective paresthesia, and a mildly

8

symptomatic left basal joint. (R. 199.) He recorded that Glover would not be able to return to work for the NYCTA. (Id.) Similarly, on September 11, 2003, Dr. King's examination revealed continued paresthesia in Glover's ulnar nerve, confirmed by positive Tinel's sign in the supraclavicular region and cubital tunnel of her left elbow. (Id.) He observed weak intrinsic strength in Glover's left elbow, when compared with her right side, which he identified as evidence of probable cubital tunnel syndrome. (Id.) Symptoms of paresthesia continued to present through examinations on October 9, 2003, November 6, 2003 and December 4, 2003. (Id.) In the November examination, Dr. King also found lateral epicondylitis of the left elbow. (Id.) In the December examination, Dr. King found that the lateral epicondylitis was being relieved by a tennis elbow strap and ice. (Id.) Although she was still on Vioxx, Glover reported a weather ache and other symptoms at her right hand basal joint. (Id.) Her prognosis for returning to work as a conductor remained guarded. (Id.)

On January 5, 2004, Dr. King reported that Glover had burned herself on her right index finger, without realizing it, because surgery had left her with "somewhat diminished" sensations in her hands. (Id.) Her left upper extremity remained tender at the lateral epicondyle, she still had a positive Tinel's sign at the left elbow, and her right basal joint was becoming more symptomatic. (Id.) At a February 2, 2004 examination, Glover reported difficulty writing, post-surgery numbness and tingling in her hands. (R. 200.) Her right basal joint was symptomatic despite bracing, and she exhibited a fairly diffuse flexor tenosynovitis of both hands. (Id.) Dr. King reported that Glover had resigned from the NYCTA. (Id.)

On March 1, 2004, Dr. King reported that Glover still was having some epicondylitis of her left elbow as well as ulnar neuropathy, and a markedly positive Tinel's sign at the left elbow. (Id.) On March 8, 2004, Dr. King recorded that Glover was having pain in her right shoulder and

9

"exquisite[] tender[ness] over the biceps groove," although she was able to elevate her shoulder. Id. Glover reported pain along her triceps/biceps area. (Id.) Radiographs taken that day did not reveal obvious abnormalities, cystic changes or calcium deposits. (Id.) On March 22, 2004, Dr. King recorded that Glover was on Indocin and had "improved dramatically." (Id.) She was able to elevate her shoulder much more easily. (Id.) At an April 5, 2004 visit, Dr. King again found Glover's right shoulder much improved, with excellent range of motion. (Id.)

On May 13, 2004, Glover returned to Dr. King's office with tenderness and pain in her right shoulder. (Id.) She reported a pain level of 8 out of 10 and was given a cortisone injection. (Id.) On June 9, 2004, Glover again was reevaluated, and Dr. King found that her right shoulder had "improved dramatically," with excellent range of motion. (Id.) She reported a pain level of 6 out of 10. (Id.) Dr. King recorded that Glover's right wrist was again symptomatic, she continued to have difficulty with her left elbow and a positive Tinel's sign, and that her intrinsic strength was weaker on her right side than her left. (Id.)

On July 8, 2004, Dr. King recorded ulnar and median neuropathy on Glover's left upper extremity. (R. 201.) On August 9, 2004, Glover reported continued difficulty, and Dr. King requested authorization for cubital tunnel release of the left upper extremity. (Id.) On September 8, 2004 and October 7, 2004, Glover continued to present symptoms of ulnar neuropathy in her left elbow. (Id.) In the September visit, Glover also described symptoms in her neck, which Dr. King thought might have been redicular in nature. (Id.)

Dr. King completed a "medical assessment questionnaire" on October 13, 2004 concerning Glover's hands. (R. 232-33.) He diagnosed carpal tunnel syndrome, basal joint arthritis, tenosynovitis and trigger finger. (R. 232.) He stated that Glover experienced symptoms severe enough to interfere constantly with attention and concentration, and that she had to wear

10

an orthopedic device at all times. (Id.) The impairment was expected to last at least twelve
months and his prognosis was guarded. (R. 233.) In response to a question asking "[h]ow many
pounds can your patient lift and carry in a competitive work situation," he said that she could
"never" lift even "less than" 10 pounds.[4] (Id.) He wrote that Glover could not perform repetitive
activities and could do no writing, typing, lifting, pushing or pulling. (Id.)

On November 4, 2004, Dr. King reported that Glover continued to be symptomatic in her
left ulnar nerve and had intrinsic weakness and a positive Tinel's sign over the cubital tunnel. (R.
202.) There is no further record of treatment until Glover's July 13, 2007 hospital admission for
complaints of sudden and severe left arm numbness and weakness, (R. 346-402; see 447-448),
but at her 2007 ALJ hearing, she testified that between 2005 (her first hearing) and 2007 (her
hospital admission), the conditions in her hands remained "basically the same" (R. 448).

## II.    The Administrative Hearing

Glover applied for disability benefits on or about March 25, 2003. (R. 92-94, 282, 321.)
She requested an administrative hearing, which was held on January 4, 2005 before ALJ Robin J.
Artz. (R. 42-60, 422-441.) At that hearing Glover amended the onset of her alleged disability
from July 1, 1997 to June 13, 2001 because of gaps in the medical record. (R. 47, 62-66, 282.)

At her ALJ hearing, Glover testified that she was able to travel to the hearing by bus,
without anyone's assistance, although she had to use her arm to hold onto the post. (R. 46.)
Regarding her surgeries, she testified that after each of her carpal tunnel releases, her hands
improved for about six months, but then swelling, numbness and shooting pain would resume.
(R. 51.) Glover added that over the course of her treatment with Dr. King, she received epidural
and cortisone injections in both hands — five in the right and "maybe" three in the left — but

---

[4] The form provided a range of weight options from "less than" 10 pounds to 50 pounds and asked the doctor to
mark whether the patient could "never," "occasionally" or "frequently" lift and carry that amount. (R. 233.)

their effects would last for only about three days. (R. 58.) She said that she had stopped physical therapy after two years, in June or September of 2004, because it no longer helped her hands. (R. 52.)

Glover testified that she was taking Naproxen for pain and two blood pressure medications. (R. 53.) She said the pain in her hands was episodic. Two or three days a week it was so bad that she could not get out of bed, although about one day a week was pain free. (R. 55-56.)

Glover stated that she could not make tight fists with her hands and had problems gripping door knobs, holding jars to twist and open, and holding glass items. (R. 53-54.) She found her difficulties more pronounced in her right hand and would use her left hand for support. (R. 54.) She said she could not write at all with her right hand, but had to use her left hand instead. (Id.) She said that she could read, but only with a clip book stand that held her book in place because otherwise her hand would lock painfully in one position. (R. 57-58.) She further testified that she would be able to sit and type at her personal computer for "maybe five minutes" before her hand cramped up, resulting in sharp pain. (R. 58.) Glover also said that before the onset of her condition, she could ride bikes regularly, play basketball and practice photography, but could no longer do those activities because they required the use of her right hand. (R. 57.)

Glover further stated that she could walk, stand and sit without limitation and could pick up something if she dropped it. (R. 54.) She stated that she did not go shopping, but hypothetically could lift and carry "[m]aybe 10 pounds" using one hand to support the other. (R. 54-55, 57.) Even when using both hands, she would occasionally drop what she was holding. (R. 57.) She had difficulty buttoning her clothes and tying her shoelaces. (R. 56.) Indeed, she had not worn laced shoes since she stopped working in 1997. (Id.) Glover's sisters shopped and cooked

12

for her. (Id.) A helper came once a week to do the cleaning and laundry because "[g]ripping the utensils in the house to do the cleaning create[d] a problem." (R. 56-57.) But she did not have any difficulty with personal hygiene except for needing assistance to put on dresses or other similar clothing. (R. 56.)

## III.  Subsequent Proceedings and the Final Administrative Determination

The ALJ issued a decision, dated March 17, 2005, denying benefits to Glover. (R. 31-41.) On November 4, 2005, she issued an amended decision without changing the outcome or substance. (R. 252-62.) On August 1, 2005, Glover moved for review of the ALJ's decision. (R. 240-47.) On April 17, 2006, the Appeals Council denied Glover's request, making the ALJ's decision final. (R. 7-10.)

Glover filed a civil action contesting that decision. Glover v. Astrue, 06 Civ. 4591 (NRB). By stipulation and order dated April 5, 2007, the District Court remanded the case to the Commissioner to develop the record further. (R. 302-03.) On May 3, 2007, the Appeals Council vacated the prior ALJ decision and remanded the case back to the ALJ. (R. 299-300.) On November 14, 2007, the ALJ held a supplemental hearing where Glover and her attorney appeared and a vocational expert testified. (R. 442-72.)

At this 2007 administrative hearing, Glover further testified that she had tried to work in December 2005 as a tax preparer for H&R Block, but was able to train for only three days because her hands swelled up. (R. 446-47.) In addition, she repeated her 2005 testimony to the effect that, before July 2007, she had no limitations sitting and standing and could bend and pick up small items from the floor. (R. 451.) She stated she would not be able to carry an eight pound milk container one block from the store to her home, but would be able to lift and carry one pound of bread comfortably. (R. 452.) She reiterated that pain, tingling and numbness would

13

return six months after each carpal tunnel release. (R. 455.) She added that the pain has never really subsided, and that pain was the reason she needed assistance with her daily living. (Id.) She testified that she needed assistance attending to home, dressing and personal hygiene matters as early as 1997, and her need for assistance has continued since then. (R. 455-56.)

Miriam Greene, a vocational expert, testified at the administrative hearing following Glover's testimony. (R. 457-71.) The ALJ asked Greene to consider a hypothetical individual with Glover's same age, education and past relevant work, who was able to lift, carry, push and pull two pounds occasionally, stand and walk up to six hours out of an eight-hour day, and sit for up to six hours out of an eight-hour day, but could not perform frequent fine manipulations with either hand. (R. 460-62.) With this hypothetical individual in mind, Greene stated that such a person could not perform Glover's past work. (R. 461.)

That individual could, however, work as: (1) a gate guard, which is semi-skilled exertionally light work, with 200,000 jobs in the national economy and 3,000 in New York City; or (2) a surveillance system monitor, which is unskilled, exertionally sedentary work, with 200,000 jobs in the national economy and 1,000 jobs in New York City. (R. 461-65.) Greene further testified that the gate guard job would involve no more than occasional writing and essentially no computer work.[5] (R. 468-71; see 291.) She stated these were entry level jobs and that her list was close to exhaustive. (R. 463-64.)

On November 20, 2007, the ALJ issued a decision finding that Glover was disabled as of July 13, 2007, when she had suffered a sudden onset of arm paralysis. (R. 280-92.) The ALJ found that Glover was not disabled before July 13, 2007 because her RFC permitted her to work

---

[5] The ALJ noted that gate guards might sign their names a few times a day, check off guests' names and fill out incident reports. Through a discussion with Greene, the ALJ distinguished that gate guards usually do not sign people in and out of a gate point security log and that a gate usually is opened just once at the beginning of a shift for car traffic. (R. 468-71; see R. 291.)

14

as a gate guard or surveillance system monitor. (Id.) The ALJ's decision became the final decision of the Commissioner on September 24, 2010, when the Appeals Council denied Glover's request for review. (R. 248-51, 264-73, 276.)

On November 22, 2010, Glover filed this action. On February 8, 2011, it was referred to Magistrate Judge Frank Maas for a report and recommendation. The parties' cross-motions for judgment on the pleadings were fully submitted on February 6, 2012. On September 24, 2012, the case was reassigned to my docket.

## DISCUSSION

### I.    Standard of Review

A party may move for a judgment on the pleadings "[a]fter the pleadings are closed — but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Dargahi v. Honda Lease Trust, 370 F. App'x 172, 174 (2d Cir. 2010).

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). "Where there is substantial

15

evidence to support either position, the determination is one to be made by the factfinder."

Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). This means that if there is sufficient

evidence to support the final decision, a district court must grant judgment in favor of the

Commissioner.

## II.    Definition of Disability

A claimant is disabled under the Social Security Act if the claimant is unable "to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The

claimant's impairment must be "of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy." § 423(d)(2)(A). The disability

must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." §

423(d)(3).

Under the authority of the Act, the Social Security Administration has established a five-

step sequential evaluation process when making disability determinations. See 20 C.F.R. §§

404.1520, 416.920. The steps are followed in order; if it is determined that the claimant is not

disabled at a step of the evaluation process, the evaluation will not progress to the next step. The

Court of Appeals for the Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in
> substantial gainful activity. Where the claimant is not, the Commissioner next
> considers whether the claimant has a "severe impairment" that significantly limits
> her physical or mental ability to do basic work activities. If the claimant suffers
> such an impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment that is listed in 20 C.F.R. Part 404,
> Subpart P, Appendix 1. Assuming the claimant does not have a listed impairment,

16

the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–184 (2d Cir. 2003) (citation omitted). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the final step. Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998). Thus, in order to support a finding that the claimant is not disabled at the fifth step, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given the claimants RFC, age, education and past relevant work experience. 20 C.F.R. §§ 404.1512(f), 404.1560(c), 416.912(f) and 416.960(c).

## III.  The ALJ's Finding That Glover Was Not Disabled

The ALJ concluded, and it is not contested in this appeal, that Glover met her burden of proof with regard to the first four steps of the sequential evaluation of disability. Glover challenges step five where the ALJ determined that, based on Glover's RFC and other factors, there were sufficient jobs available to Glover in the local and national economies. The Court must assess whether these findings were supported by substantial evidence.

### A.  Steps One Through Four

Applying the sequential evaluation of disability, at step one the ALJ found that Glover had not performed substantial gainful activity since her June 13, 2001 alleged onset of disability. (R. 284.) The parties do not contest this determination, and it is consistent with Glover's testimony that she had no meaningful work since then. (R. 50-51.) Glover did testify that she worked three days in December 2005 as a tax preparer trainee for H&R Block, but the ALJ

17

found this was too brief a time to be considered substantial gainful activity. (R. 284.) The ALJ correctly applied the law at step one, and there is substantial evidence to support her decision.

At step two, the ALJ found that Glover's residual bilateral hand weakness constituted a "severe" impairment following her successful carpal tunnel surgery on her right hand in December 2001, and on her left hand in December 2002. (R. 284.) An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). The parties do not contest this determination, and there is substantial evidence in the record to support it, including: (1) Glover's testimony regarding her subjective pain; (2) her inability to perform daily activities, return to work as a conductor or work as a tax preparer; (3) the January 17, 2002 EGM/NCV study finding carpal tunnel syndrome in her left hand; (4) the reports from hand therapist Lang finding limitations in Glover's ability to grip, pinch, lift, push and pull; and (5) Dr. Ivanson's finding of marked limitation in Glover's right arm.

At step three, the ALJ determined that Glover's "severe" bilateral hand weakness did not meet the criteria for a *per se* disability as set forth in the applicable Social Security Regulations. See 20 C.F.R. Part 404, Subpart P, Appendix 1; (R. 284). The ALJ did not set forth her reasoning for this determination beyond a statement that the impairment did not match any listed impairments. The parties do not, however, contest her determination at this step, and a review of Glover's medical history in conjunction with the Appendix confirms the ALJ's conclusion.

Section 1.00 of Appendix A lists two major dysfunctions of a joint that would equal a *per se* disability. A claimant must establish the "inability to ambulate effectively on a sustained basis for any reason" or "the inability to perform fine and gross movements effectively on a sustained basis for any reason." Appendix A, § 1.00(B)(2)(a).

18

The inability to ambulate effectively means "an extreme limitation of the ability to walk." §1.00(B)(2)(b)(1). Glover testified that she had traveled alone to her 2005 hearing and generally did not have any problems walking. (R. 46, 54.) At her 2007 hearing, she testified that she could sit or stand without limitations. (R. 451.)

The inability to perform fine and gross movements effectively means "an extreme loss of function of both upper extremities." Appendix A, § 1.00(B)(2)(c).[6] The record supports a conclusion that Glover had significant function in at least one upper extremity. The January 17, 2002 EGM/NCV study found mild carpal tunnel syndrome in the left hand, but no neuropathy on the right. (R. 227-28.) Glover testified that she could write with her left hand, (R. 54), and could lift 10 pounds with both hands (R. 54-55, 57). On May 27, 2003, Glover told her hand therapist Lang that she did not have significant problems with her left hand. (R. 223.) An October 2002 report from Lang found Glover's gross grasp strength to be 50 pounds in her right hand and 90 pounds in her left, and a May report following Glover's December surgery found her still exerting 80 pounds of pressure in her left hand. (R. 200, 222.) Dr. Ivanson, in examining Glover on May 29, 2003, found "5/5" muscle strength in her left arm. (R. 177.) Although the record contains many references to limitations Glover experienced with her hands, a limitation is not the same as an "extreme loss of function." Because Glover did not have any problem walking and at

---

[6] The Appendix further defines such an extreme loss as:

> an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

Appendix A, § 1.00(B)(2)(c).

least one upper extremity functioned, substantial evidence exists to support the ALJ's finding that Glover was not *per se* disabled at step three.

At step four, the ALJ determined that Glover retained the RFC to occasionally lift, carry, push and pull up to two pounds at a time, and stand and walk up to six hours out of an eight-hour work day, but could not perform frequent fine manipulations with her hands. (R. 285.) In light of this RFC, Greene testified that a hypothetical person in the same situation as Glover could not do her past relevant work because of the exertional limitations and lack of ability to perform frequent fine manipulations. This conclusion was supported by Dr. King's statements that Glover could no longer perform her past work as a conductor, and the absence of contrary evidence or objection by a party. Substantial evidence exists that Glover could not have performed her past relevant work.

## B. Step Five: The ALJ's Determination of Glover's RFC and Ability to Perform Other Work

After determining that Glover had satisfied the first four steps of the sequential analysis, the ALJ found at step five that there were a significant number of jobs in the local and national economies that Glover could perform based on her physical limitations, age, education and past relevant work. Glover challenges this outcome. The ALJ's determination of Glover's RFC, and that her RFC allowed her to perform other work, however, is supported by substantial evidence.

### 1. Substantial Evidence Supports the Determination of Glover's RFC

The ALJ cited substantial evidence in her determination of Glover's RFC — that she could occasionally lift, carry, push and pull up to two pounds at a time, stand and walk up to six hours in an eight-hour work day, but could not perform fine manipulations with her hands. (R. 285-90.) This included clinical findings by the treating physician, objective medical evidence,

20

clinical notes by a hand therapist, examination by a consulting neurologist and Glover's own testimony.

The clinical findings by Glover's treating physician found significant improvements in her condition. Indeed, throughout the relevant period, Dr. King recorded repeated positive changes. (See R. 287.) These included significant reduction in Glover's paresthesia complaints, (R. 196-98), as well as successful reductions in pain and increases in movement following Glover's "successful" surgeries (R. 163-65, 196).

Objective medical evidence also supported the ALJ's decision. For example, the ALJ noted that the January 17, 2002 EMG/NCV study performed at Mt. Sinai revealed only mild carpal tunnel syndrome on Glover's left side, no neuropathy on her right, and described her condition as consistent with "well-treated carpal tunnel syndrome." (R. 286-87.)

Clinical notes recorded by hand therapist Lang from June 2003 through September 2003 offered further support. These described Glover performing light and moderate resistance tasks, making "steady gains," and using her right hand "with escalating success and spontaneity" due to therapy. (R. 217-18, 220, 226; see 288.) As of October 2002, Glover may have remained somewhat limited in "sustained" and "repetitive" right hand manipulation, but her gross grasp strength still generated 50 pounds of pressure in that hand (as well as 90 pounds of pressure in her left), and her range of motion, strength and functioning continued to improve. (R. 220.)

This evidence was reinforced by the opinion of a consulting neurologist. In May 2003, Dr. Ivanson reported Glover's muscle strength was "5/5" in both of her legs and her left arm. (R. 177.) Glover stated that she could not use her right upper extremity, but Dr. Ivanson noted Glover could move her right side when she thought she was unobserved. (Id.) His examination revealed normal muscle tone and no apparent muscle atrophy or rigidity. (Id.) He further noted

21

that although Glover had marked limitation for her right upper extremity only, she was otherwise unlimited in her ability to stand, walk or sit. (R. 178; see 288.)

Finally, relevant portions of Glover's own testimony were consistent with the ALJ's determination. In her 2005 and 2007 hearings, Glover testified, respectively, that she could potentially lift ten pounds using both hands and could carry one pound of bread. (R. 54-55, 452.) At those hearings, she also testified that, before July 13, 2007, she could bend, stand, walk or sit without limitation. (R. 54, 451.) In addition, at her May 27, 2003 therapy, she told Lang that she had no significant problems with her left hand and her range of motion was within normal limits. (R. 223.)

The ALJ also considered and weighed Glover's testimony concerning her condition. Among other facts, the ALJ noted that Glover had only one pain free day a week and intense pain two to three days per week. (R. 286.) She noted that Glover could dress herself but buttoning was difficult, dropped items or could not grip tools or cook, had a cleaner for her apartment, could type for only five minutes before cramping, could not carry a full bag of groceries, found it difficult to grip doorknobs and open jars, and had ceased her hobbies. (Id.) Based on this evidence, the ALJ found that Glover's medically determinable impairments could produce some of the alleged symptoms and limitations, and that she could not perform fine manipulations with her hands. (R. 285-86.) But based on the record as a whole, she also found that, "[b]efore July 13, 2007, even if [Glover] was unable to perform frequent fine manipulations, she was able to perform a wide range of light work activity because most light jobs do not require the performance of frequent fine manipulations that is typical of sedentary work." (R. 289.)

22

### 2.  Substantial Evidence Supports the Determination That Glover Could Perform Other Work

Substantial evidence also supports the ALJ's determination that Glover's RFC allowed her to perform the duties of Surveillance System Monitor (200,000 jobs nationally; 1,000 locally) and Gate Guard (200,000 jobs nationally; 3,000 locally). (R. 461-65.)[7] Glover suggests that the vocational expert's testimony potentially could have further limited the number of jobs available to her, (Pl. Br. at 25), but the ALJ considered those potential limitations and established through questioning Greene that Glover's impairments would not further limit the number of jobs available to her (R. 291; see R. 467-71).

Glover primarily argues that the two available positions of Surveillance System Monitor and Gate Guard do not amount to jobs existing in sufficiently substantial numbers. Courts repeatedly have found the Commissioner's burden satisfied with fewer jobs available locally and in the national market than were available to Glover. See, e.g., Dumas v. Schweiker, 712 F.2d 1545, 1549 (2d Cir. 1983) (time clerk position with 150 jobs in region and 112,000 nationally was significant number of jobs); Daniels v. Astrue, 10 Civ. 6510 (RWS), 2012 WL 1415322, at *17 (S.D.N.Y. Apr. 18, 2012) (surveillance system monitor with 1,236 jobs in region and 25,000 nationally was significant number of jobs); Henry v. Astrue, 07 Civ. 0957 (WCC), 2008 WL 5330523, at *11 (S.D.N.Y. Dec. 17, 2008) ("While there is no specific number that is considered significant," Commissioner's burden was satisfied by ALJ's determination that there were 1,208 jobs in the local economy.) (collecting cases). For this reason, the ALJ correctly found that there are a significant number of jobs that exist in the local and national economies that Glover could perform based on her physical limitations, age, education and past relevant work.

---

[7] A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to perform any of those jobs. 20 C.F.R. §§ 404.1566(e), 416.966(e); see, e.g., Calabrese v. Astrue, 358 F. App'x. 274, 275-76 (2d Cir. 2009); Butts v. Barnhart, 416 F.3d 101, 103-04 (2d Cir. 2004).

## IV.   Glover's Additional Objections to the ALJ's Findings

Glover also objects to the ALJ's determination on the grounds that controlling weight

should be accorded to the opinion of Dr. King, and deference should be given to Glover's

subjective complaints of pain. Substantial evidence exists, however, to support the ALJ's

determination on these two points.

### A.  Assessing Opinion of Glover's Treating Physician

Glover contends that the ALJ improperly declined to accord controlling weight to the

opinion of treating physician Dr. King. With respect to the determination of the nature and

severity of a claimant's impairment:

> [t]he SSA recognizes a "treating physician" rule of deference to the views of the
> physician who has engaged in the primary treatment of the claimant. According to
> this rule, the opinion of a claimant's treating physician as to the nature and
> severity of the impairment is given "controlling weight" so long as it is "well-
> supported by medically acceptable clinical and laboratory diagnostic techniques
> and is not inconsistent with the other substantial evidence in [the] case record."

Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted). Nevertheless, "[a]

treating physician's statement that the claimant is disabled cannot itself be determinative." Snell

v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). "[T]he less consistent that opinion is with the record

as a whole, the less weight it will be given." Id. It is the Commissioner who is "responsible for

making the determination or decision about whether [the claimant] meet[s] the statutory

definition of disability." 20 C.F.R. § 404.1527(d)(1). Thus, "[w]hen other substantial evidence in

the record conflicts with the treating physician's opinion . . . that opinion will not be deemed

controlling." Snell, 177 F.3d at 133.

If an ALJ declines to afford controlling weight to the opinion of a treating physician, the

ALJ is obliged to consider certain factors under 20 C.F.R. § 404.1527(c). These include:

24

(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. The regulations also specify that the Commissioner will always give good reason in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.

Halloran, 362 F.3d at 32 (citations and internal quotation marks omitted). Failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand. Burgess, 537 F.3d at 129-30 (citations omitted).

Substantial evidence supports the ALJ's decision to decline controlling weigh to the opinion Dr. King set forth in his October 13, 2004 medical assessment questionnaire. (R. 288; see 232-33.) Beginning with Dr. King's own clinical notes, the ALJ repeatedly found evidence suggesting Glover was less impaired than the questionnaire indicated. Citing to a February 2004 entry, for example, the ALJ contrasted Dr. King's clinical note that Glover had "difficulty writing" with the questionnaire's statement that Glover could do "no writing." (R. 200, 233; see also 54.) The ALJ also found numerous entries undermining the questionnaire, where Dr. King would report that Glover's condition had improved or her carpal tunnel surgeries had been successful. (R. 287-88; see 163-65, 196-98.) Moreover, the ALJ found that Dr. King often described Glover's subjective feelings without providing empirical support. (R. 287.) This subjectivity diminished the reliability of the questionnaire's conclusions from the evidence; as the ALJ noted, statements about "reduced strength or pinch" are not quantified. (Id.)

The ALJ also found evidence in the clinical notes to suggest that Glover exaggerated her symptoms. For example, the ALJ noted that on June 6, 2002, Dr. King recorded that Glover was having "severe difficulty" with her right hand and a month later that Glover was driving despite

25

those complaints. (R. 287; <u>see</u> 196.)[8] There was ample evidence of Glover's subjective pain, but there also was ample evidence of significant reductions in pain in follow-up visits, casting doubt on Glover's characterizations of her symptoms to Dr. King. (R. 193-200.)

Other parts of the record supported the ALJ's conclusion. The questionnaire stated that Glover could "never" lift any weight.[9] But in the 2005 hearing Glover testified that she could potentially lift ten pounds with both hands, (R. 55), and even in her 2007 hearing she said she would be able to lift and carry one pound (R. 452). The questionnaire stated Glover could do no repetitive activity, but both Dr. Ivanson's report and Lang's treatment notes expressed significant ranges of hand movements. (R. 288.) Indeed, in his May 29, 2003 consulting exam, Dr. Ivanson found Glover normal in all respects except for her right upper extremity. (R. 176-77.) Based on the totality of this evidence, the ALJ was well within her discretion to decline controlling weight to Dr. King's evaluation.

Glover argues that the evidence of her impairment supports Dr. King's questionnaire, and that the ALJ erred by refusing to give Dr. King's opinion controlling weight. She cites to the EMG/NCV's confirmation of bilateral carpal tunnel syndrome, Glover's use of medication, her visits to physical therapy, and Dr. King's clinical findings of a limited range of motion, tenderness and positive Tinel's signs as support for this position. (Pl. Br. at 18-19.) This evidence does support a finding that Glover had some impairment — as the ALJ found at step two of the five-step sequential evaluation. Glover's argument fails because her evidence of some limitation does not confirm the total limitation Dr. King's questionnaire describes. The

---

[8] The ALJ also found that Dr. King's June 2002 amendment of his past clinical notes at Glover's request seriously undercut his credibility. (R. 287; <u>see</u> 196.) Glover asked for this amendment, however, because the judge at her workers' compensation hearing "asked that she have [the] consequential injury for her left hand as a result of overusing it dictated." (R. 196.) This was a legitimate reason that should not cast doubt on Dr. King's credibility.
[9] Although, Dr. King's marking that Glover could "never" lift "less than 10 pounds" might imply that he thought she could still lift some weight, later on the form he wrote that Glover could do "no lifting." (R. 233.)

Commissioner's argument succeeds because there is substantial evidence to support the ALJ's findings that Glover was less impaired than her treating physician described. Montaldo v. Astrue, 10 Civ. 6163 (SHS), 2012 WL 893186, at *15 (S.D.N.Y. Mar. 15, 2012) (ALJ properly declined controlling weight to questionnaire because, among other reasons, questionnaire conflicted with treating physician's own findings and findings of another doctor); see also Edwards v. Barnhart, 06 Civ. 402 (CFD) (TPS), 2007 WL 708802, at *10 (D. Conn. Mar. 6, 2007) (ALJ properly declined controlling weight to questionnaire when unsupported by substantial evidence that included clinical and laboratory diagnosis; finding questionnaires are not type of medical evidence ALJ must consider in determining controlling weight).

Glover also suggests that the ALJ "picks and chooses" quotes from Dr. King's medical reports to support her conclusion. But the cases Glover cites are ones where the ALJ erred by relying on selected portions of the evidence and ignoring the rest of the record. See, e.g., Kirchwey v. Heckler, 83 Civ. 6678 (SWK), 1986 WL 2183, at *2-3 (S.D.N.Y. Feb. 13, 1986) (ALJ picked selective phrases to support finding of no disability from letters arguing plaintiff was disabled and failed to reference letters favoring disability determination); Scacchetti v. Sec'y of Health and Human Servs., 83 Civ. 299T, 1987 WL 9739, at *4 (W.D.N.Y. Feb. 27, 1987) (ALJ rejected treating physician's findings and Commissioner's own examining physician in favor of a doctor who had never examined claimant). Unlike the ALJ in those cases, the ALJ here did not rely on selected portions of the evidence and did not ignore the rest of the record. Instead, she cited and weighed all the evidence and found reason to discount the treating physician's questionnaire based on other statements by that treating physician and statements by the consulting physician that were themselves based on an actual examination of Glover.

27

To be sure, in making a determination, an ALJ does not need to resolve every conflict in the record. Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." Alston, 904 F.2d at 126. Even if Dr. King's questionnaire created substantial evidence to find Glover disabled, based on the entirety of the record there is also substantial evidence to support the ALJ's position. For this reason, the ALJ's finding should be upheld.

### B. Assessing Glover's Credibility

Glover also argues that the ALJ erred as a matter of law in assessing her credibility. A credibility finding by an ALJ is entitled to deference by a reviewing court and will be set aside only if it is not set forth "with sufficient specificity to enable [a reviewing court] to decide whether [it] is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); see Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded [to] the ALJ's [credibility] determination because [the ALJ] heard plaintiff's testimony and observed [plaintiff's] demeanor.").

The ALJ's credibility finding is set forth with sufficient specificity. She considered Glover's own testimony during her hearing, (R. 285-86), the medical record, (R. 286-287), and the opinions of various medical experts (R. 287-288). She explained the parts of the record that ran counter to Glover's assertions of her subjective pain. (R. 286-90.) She then found that Glover's "medically determinable impairments reasonably could be expected to produce some of the alleged symptoms and limitations, but that the claimant's statements concerning the intensity, persistence and limiting effects of th[o]se symptoms and limitations [were] not entirely supported by the record until July 13, 2007." (R. 286.)

28

Glover argues that the ALJ rejected her subjective complaints "without stating a clear reason for failing to account for them." (Pl. Br. at 21.) But the ALJ articulated at least two separate bases for her determination. First, the ALJ found that Glover's claimed lack of meaningful function in her upper extremities was not supported by the record. To support this claim, the ALJ referenced Glover's testimony that she had no limitations in her ability to walk, stand, bend and sit. (R. 286; see 45, 451.) The ALJ noted that in 2002 Lang found steady gains in therapy and increased strength and functioning in Glover's hands, (R. 288; see 215, 217-18, 220), and that in May 2003 Glover told Lang that she had no significant problems with her left hand and her range of motion was within normal limits (R. 288; see 223). Second, the ALJ found evidence to suggest Glover overstated some of her symptoms. (R. 288.) As an example, the ALJ pointed to Dr. King's treatment notes, which described repeated improvements and stabilizations of injuries, as well as instances that indicated she could drive and write despite her hand impairments. (R. 287-88; see 196, 200.) The ALJ also found significant Dr. Ivanson's observation that while Glover claimed to be unable to move her right hand and forearm in fact she did move it when "left unobserved." (R. 288; see 177.) Glover's argument fails because the ALJ articulated two separate bases for her determination.

Glover also argues that the ALJ erred by not fully considering Glover's symptoms, (Pl. Br. at 21-23), citing two cases for the proposition that reversal is proper when the ALJ fails to consider a plaintiff's testimony (Pl. Br. at 22). In both cases, the ALJ ignored evidence when weighing the plaintiff's subjective complaints. In Woodford v. Apfel, 93 F. Supp. 2d 521, 530 (S.D.N.Y. 2000), the ALJ did not consider plaintiff's "knife-like" pain and numbness, repeated complaints to her doctor, diagnosis of a pain causing condition, and anti-inflammatory drugs taken to treat her injuries. In Tavarez v. Comm'r, Soc. Sec. Admin., 00 Civ. 4317 (DLC), 2001

29

WL 238225, at *4-5 (S.D.N.Y. Mar. 9, 2001), the ALJ did not consider evidence that plaintiff took medications, had difficulty sleeping, and had trouble performing daily chores.[10]

Although the ALJ could have drawn a clearer link between the facts and her analysis of those facts in this case, the ALJ did include nearly all of Glover's subjective symptoms and claims in her decision. (R. 285-86.) She found that Glover's medications helped with her pain and had no side effects. (R. 286.) She described Glover's feelings of electrical pains up her arms and hands, her intense pain two or three days per week, her trouble gripping objects, and that her physical therapy provided only temporarily relief. (Id.) Moreover, she considered those symptoms in her analysis. The ALJ used Glover's own testimony about her ability to perform activities to establish she was not disabled during the relevant period. (See id.) She compared Glover's symptoms before and after July 13, 2007 in determining that Glover was not sufficiently impaired to be legally disabled until July 13, 2007. (Id.) Glover correctly notes that the evaluation of symptoms must extend beyond objective clinical findings. (Pl. Br. at 22) (citing Tavarez, 2001 WL 238225, at *5). But this is precisely what the ALJ has done. The ALJ's opinion considered Glover's symptoms and was set forth with sufficient specificity to enable a determination that the opinion was supported by substantial evidence. (R. 285-88); see 20 C.F.R. §§ 404.1545, 416.945.

## V.    Obligation to Further Develop the Record

As an alternative to reversing the ALJ, Glover argues that the case should be remanded to further develop the record because the ALJ had a responsibility to request additional information from Dr. King to resolve conflict or ambiguity in the record. (Pl. Br. at 19-20.) "[B]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an

---

[10] Moreover, in Tavarez, the Commissioner actually conceded "that the ALJ did not consider [the plaintiff's] subjective allegations of pain and limitations correctly." Id. at *4. There was no such concession in this case.

30

affirmative obligation to develop the administrative record." Burgess, 537 F.3d at 128. "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history . . . ." Rosa, 168 F.3d at 79. "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Id. at 79 n.5 (citation and internal quotation marks omitted).

Glover fails to point out obvious gaps in the administrative record that would obligate an ALJ to further develop the record. There is no allegation in the briefs or indication in the record that any portion of Glover's medical history was omitted.[11] There is no duty to develop when no information is shown to be missing. Streeter v. Barnhart, 01 Civ. 4066 (DLC), 2002 WL 467504, at *15-16 (S.D.N.Y. Mar. 28, 2002) (case cited by plaintiff finding no reason to re-contact plaintiff's treating physician when plaintiff did not identify any conflict or ambiguity requiring additional information).

Instead, Glover argues that if the ALJ was unsatisfied with Dr. King's questionnaire opinion, she should have attempted to obtain clarification.[12] (Pl. Br. at 19-20.) But there was no uncertainty to be resolved. The ALJ weighed the statements made in the questionnaire against the entirety of evidence and made a credibility determination. Rosa, 168 F.3d at 79, n.5. Like in Streeter, 2002 WL 467504, at *15-16, here the ALJ sufficiently developed the record on remand when she held a second hearing, permitted the claimant to testify, posed hypotheticals to a new vocational expert, and provided additional explanation for the weight accorded to the evidence.

---

[11] Although there are no medical records between Glover's last visit with Dr. King and her 2007 hospital admission, there also is no claim that records are missing. Glover testified that her condition remained "basically the same" from 2005 (her first hearing) until 2007 (her hospital admission). (R. 448.)

[12] Glover also describes as a mischaracterization the ALJ's finding that Dr. King would add content because of his June 6, 2002 addition to his medical notes. (Pl. Br. at 20-21.) But even if this was a mischaracterization, it was not material to the ALJ's determination. Moreover, the ALJ's finding went to credibility; disputing that finding would not establish a gap or inconsistency in the record.

See also Rebull v. Massanari, 240 F. Supp. 2d 265, 273 (S.D.N.Y. 2002) (ALJ credibility determination "would be rendered nugatory if, whenever a treating physician's stated opinion is found to be unsupported by the record, the ALJ were required to summon that physician to conform his opinion to the evidence."). The ALJ's determination was within her discretion and based on substantial evidence and should be upheld.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings should be GRANTED, and Glover's cross motion for judgment on the pleadings should be DENIED. Because Glover's motion for judgment should be denied, her request for remand solely for the calculation of benefits also should be DENIED.

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Colleen McMahon at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge McMahon. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:      New York, New York
            November 8, 2012

33